[S. F. No. 5248. In Bank.—September 25, 1911.]

# HENRY BOUCHARD, Appellant v. JESSE ABRAHAM-SEN et al., Respondents.

NAVIGABLE STREAMS—ISLANDS AND ACCUMULATIONS IN PROPERTY OF STATE.—Under section 1016 of the Civil Code, islands and accumulations of land formed in the beds of streams which are navigable belong to the state if there is no title or prescription to the contrary.

ID.—ISLAND ATTACHED TO MAIN LAND BY SHOALING—EXTENT OF TITLE IN ACCRETIONS OF OWNER OF MAIN LAND.—An island or accumulation of land situated in a navigable stream, which in the course of time and by the process of shoaling becomes attached to the main land, does not become the property of the owner of the adjoining main land, whose muniment of title only extended to the meander line of the river opposite the island. The interest the owner of the main land could claim in such a case would be an extension of his line to the point of the last vestige of the channel between the island and his land, the accretions of the island belonging to the island, and the accretions upon the main land belonging to the main land.

ID.—ACTION TO DETERMINE OWNERSHIP OF ISLAND OR ACCUMULATION—CHARACTER OF LAND WHEN STATE SOLD MAIN LAND—INSTRUCTIONS.—In an action involving the ownership of land so situated, in which the plaintiff relies upon a possessory title, and the defendant claims as the owner of the adjoining main land, its true character is to be determined not by what the court or jury may find to be its present condition, but by what its form was at the time when the state parted with its title to the main land. If at that time it was an island or an accumulation in waters admittedly navigable, then it belonged to the state, and subsequent shoaling of the waters whereby a connection was made with the main land would not operate to change or divest the original title. Accretions to such an island or accumulation become part of the island or accumulation itself and the possession of the island or accumulation is a possession of such accretions. Instructions which ignore the foregoing principles of law are erroneous.

ID.—PATENT TO SWAMP AND OVERFLOWED LAND—OWNERSHIP OF ACCRETIONS SINCE SURVEY.—A patentee of land included within a survey of swamp and overflowed lands, one of the meander lines of which was coincident with the bank of a navigable river, takes to the highwater mark described in such survey, with such accretions as might have been added since.

APPEAL from a judgment of the Superior Court of Humboldt County and from an order refusing a new trial. Clifton H. Connick, Judge.

The facts are stated in the opinion of the court.

J. F. Quinn, and L. F. Puter, for Appellant.

F. A. Cutler, and F. R. Sweasey, for Respondents.

HENSHAW, J.—Plaintiff brought this action in ejectment to recover from the defendants the possession of the western portion of what is known as Coonskin Island, situated on Lower Eel River, in the county of Humboldt. The complaint charged in two counts. The first alleged ownership, possession, right of possession, and ouster by defendants; the second rested upon possession and right of possession only, with ouster by defendants. The answer was by denial. The cause was tried before a jury, which rendered a general verdict in favor of the defendants. Plaintiff appeals from the judgment and from the order denying his motion for a new trial.

To the understanding of the legal contentions it is proper to say that the evidence establishes without conflict that the land in controversy was originally formed in the navigable waters of Eel River about a mile and a half above its mouth by a drift or snag in the river channel. This drift, originally of small dimensions, checked the current and caused the deposit of detritus, thus gradually forming an island. As is usual in such cases the accretions were for the most part added to the lower end so that the river here running westerly the westerly end of this island gathered accretions and continued to grow. The island had its beginning in 1866. Eel River about this island is admittedly a navigable stream. The island was for years separated from the main land by two channels, that to the south, though the narrower and shallower, was often used by sailing vessels in their river commerce. The river here is affected by the ocean tides and at the time of the trial of this action, while there was a dispute in the testimony as to whether the channel between the south bank and the island was absolutely dry at low tide, it was undisputed that at other

stages of the tide there was water in the channel from one hundred feet to one hundred and fifty yards in width. The island thus continued to grow until at the time of the trial it contained more than twenty-one acres of land. Plaintiff and defendant Andreason owned land upon the main land south of the river, the bank of the river at high tide being the limit of their northerly boundaries. Their lands are contiguous and the dividing line projected into the river and across the island would divide the latter into two unequal portions, the western portion being formed by the latest accretions. This is gravelly and unfit for cultivation, but possesses a value for fishing purposes. In 1903 defendant Andreason built a dividing fence across the island and took and continued to hold possession of this western part, asserting that it belonged to him by virtue of his patent to the shorelands from the state.

So far the evidence is without conflict, and, indeed, there is very little conflict between any parts of the evidence. Thus, it is shown by plaintiff without substantial conflict that in 1886 he puchased from the state the main land opposite the eastern portion of the island, that he found the whole island unoccupied, that he took possession of the whole of it and proceeded to exercise and continued to exercise full dominion and control over all of it. He cleared it of brush and raised crops upon such part of it as was suitable for cultivation and he built a fence running north and south through the island, which fence was constructed along the line of high tide and enclosed and protected the cultivable land from wandering cattle. The land outside of the fence was sandy and gravelly and not suitable for cultivation, and, moreover, it was impracticable to maintain a fence further westward than the line where he constructed his fence because it would be washed away by high water and the tides. He did, however, use the western portion in all suitable ways. There was a cabin upon it and for years he rented the cabin with fishing privileges. He gathered the driftwood which settled upon the lower end and prohibited others from taking the driftwood. When the cattle of defendant Abrahamsen (the tenant of defendant Andreason) wandered out to the island, as they occasionally did, he always caused them to be driven off. No one else ever exercised any acts of dominion or control over the island

during these many years, though Abrahamsen and Andreason were both well aware of his possession and claim of right of possession, and, finally, plaintiff had the land surveyed, and from and including the years 1898 and 1899 and continuously thereafter it has been assessed to him and he has paid all taxes. The description and assessment covered the western portion of the island, the portion here in controversy.

The defendant Andreason testified that he had been in possession of the island since 1884, but from his subsequent evidence it is quite plain that this use of the word "possession" is his own conclusion, for that testimony is to the following effect: Witness had known the island since 1884 when he purchased the main land from the state; he lived upon his land for about two years when he leased it; during the time he was there he never drove his cattle to the island and when they wandered over he would bring them back; he did not take any interest in the island after he rented his place in 1886; he never cut a stick of wood on the island or sunk a hole in the ground prior to the time when he put up his fence in February, 1903; he never put any mark to show any dividing line between his land and Bouchard's and never had the island surveyed. Unless his patent to the main land carried with it the western portion of the island he had never paid any taxes upon the island. The evidence of Abrahamsen, Andreason's tenant, was to the effect that he had been a tenant and had had possession of Andreason's land for about fifteen years. His cows went over on to the island whenever they were down by the river. He had no notice from Mr. Bouchard that the latter claimed the western end of the island. He knew of the cabin there and he knew that it was occupied. Mr. Bouchard told him that he could not let any fishermen in the cabin and he replied that he did not care. He knew that Bouchard had built the fence. Mr. Bouchard and the members of his family always drove off his cattle when they went on to the west end of the island. He never told them that he had the island under lease and had a right to have his cattle there. All that he told them was that when they drove his cattle off he did not want them "dogged," that is, he did not want them forced to run. He never made a complaint about driving his cattle off other than to tell the boy he did not want his cows "dogged." He never drove any of his

cattle over to the island. He did not look after the island and did not do any act upon the island. His landlord, Mr. Andreason, never took him over and put him in possession of the island. Whenever he saw his cattle upon the island he himself always drove them home.

Defendant's additional evidence touching title is that he is the owner of the main land embraced in swamp land survey 41, the northern boundary of which lands follow the meanderings of the south bank of the Eel River. Defendant's land by this survey and patent, of course, extends no further than highwater mark on the river. (*Heckman* v. *Sweet,* 99 Cal. 303, [33 Pac. 1099].) Section 1016 of the Civil Code declares that "islands and accumulations of land, formed in the beds of streams which are navigable, belong to the state, if there is no title or prescription to the contrary." Defendant's contention is that Coonskin Island is not an island belonging to the state within the meaning of this language, but (quoting from his brief), that the waters of Eel River suddenly changed its channel and that this (Coonskin Island) was at best a sandbar extending from defendant Andreason's land, defendant's northern boundary forming the south bank of Eel River; that as the meander line established by swamp and overflow survey 41 was coincident with the south bank of Eel River, the land in controversy was within this meander line, and, consequently, was a part of the lands patented. That Eel River always flowed north of Coonskin Island and at no time did any portion of it flow in its natural course between said land and the upland of defendant; that there was a depression on the south side through which water ran only during an extreme high tide."

We have thus been at pains to set forth the evidence, not in consideration of the proposition that it is insufficient to justify the verdict of the jury since that question in the condition of the record is not before us, but because it is necessary that the evidence and varying contentions of counsel should be clearly understood when we come to review the instructions of the court which are complained of by appellant. Whatever may have been the condition of Coonskin Island at the time of the trial no doubt can be entertained from the evidence that it was originally a true island formed in the channel of a navigable stream. There is no word of evidence "that

the waters of Eel River suddenly changed its channel and thus made a sandbar." The testimony is overwhelming and is undisputed that it was formed as above described and that it was an island at the time plaintiff acquired the main land south of it. But if by any conceivable interpretation of the evidence it could be said that it was not originally an island, still it was not a sandbar formed by a sudden change of channel "and extending out from defendant Andreason's land." If it was not a true island the least that can be said is that it was an accumulation of land contemplated by section 1016 of the Civil Code original title to which belonged in the state. And, finally, it should be added that if in the course of time and by the process of shoaling such island or accumulation did become attached to the main land, defendant's patent calling for the meander line of the south bank of Eel River at highwater would not and could not be stretched so as to include this land. Such meander lines upon the banks of streams subject the owners to loss by erosion and give them a corresponding gain by slow accretion. The utmost that defendant could claim in such a case would be an extension of his line to the point of the last vestige of the channel between the island and his land, the accretions of the island belonging to the island and the accretions upon the south bank belonging to the main land. This, however, is a very different thing from claiming title to an island or to an accumulation because subsequent changes connect it with the main land, and in this case, as we have said, even the connection with the main land is in sharp dispute, the evidence of the defense at the utmost being that at low tide there is such connection. (*Fillmore* v. *Jennings,* 78 Cal. 635, [21 Pac. 536]; *Glassell* v. *Hansen,* 135 Cal. 547, [67 Pac. 964]; *Buse* v. *Russell,* 80 Mo. 209; *Salem Imp. Co.* v. *McCourt,* 26 Ore. 93, [41 Pac. 1105]; *Hahn* v. *Dawson,* 134 Mo. 581, [36 S. W. 233]; *Benne* v. *Miller,* 149 Mo. 228, [50 S. W. 824]; *Bellefontaine Imp. Co.* v. *Niedringhaus,* 181 Ill. 426, [72 Am. St. Rep. 269, 55 N. E. 184]; *Moore* v. *Farmer,* 156 Mo. 33, [79 Am. St. Rep. 504, 56 S. W. 493]; *Holman* v. *Hodges,* 112 Iowa 714, [84 Am. St. Rep. 367, 84 N. W. 950, 58 L. R. A. 673].)

The test of the true character of Coonskin Island is not what court or jury may find to be its present condition, but

what was its form at the time the state parted with its title
to the main land? If at that time it was an island or an
accumulation in waters admittedly navigable, then it belonged
to the state and subsequent shoaling of the waters whereby
a connection was made with the main land would not operate
to change or divest the original title. Again, it is equally
well settled that the accretions to such an island or accumu-
lation become part of the island or accumulation itself and
the possession of the island or the accumulation is a posses-
sion of such accretions. *Bellefontaine Imp. Co.* v. *Niedring-
haus,* 181 Ill. 426, [72 Am. St. Rep. 269, 55 N. E. 184].)

A just complaint made against the instructions given in
this case is that the court refused to charge in the precise
language of section 1016 of the Civil Code, and likewise
failed to enlighten the jury upon the principle of law above
adverted to,—namely that it was the condition of the land at
the time the state parted with its title to the adjacent main
land and not at the time of the trial which determined its
character. Thus, instruction XX is as follows: "If you find
from the evidence that Eel River is a navigable stream and
in which at the point where the land in dispute lies the tide
ebbs and flows, and that said Eel River is the northern bound-
ary line of defendant's land then I charge you that although
said boundary line is one which may gradually and imper-
ceptibly change, yet it became and is a certain and fixed
boundary of defendant's land and up to which his legal title
extends; and if you find from the evidence that the land in
controversy not being an island lies between the said meander
line as established by that state survey and the southern bank
or water line of Eel River then I charge you that the defend-
ant, Andreason, was the owner of said land and entitled to
the possession of the same on the 15th day of February, 1903,
unless you find from the evidence that he had in some
manner become divested of the same." This instruction takes
no account of the fact that the land, even if it were not an
island, still if it were an accumulation would belong to the
state and would not be included in defendant's patent. But
even more serious than this is the declaration that "If you
find from the evidence that the land in controversy not being
an island lies between the said meander line," etc. Here the
jury was instructed that the character of the land at the time

the state parted with its title to the main land was not only not controlling but was not to be considered and that the present condition alone was to be regarded by them and so if they found that it is not an island and is included within the meander line, it belonged to defendant. The misleading character of this instruction is emphasized by the one next given where the court charged that "to constitute an island in a river the same must be of a peramnent character, not merely surrounded by water, when the river is high, but permanently surrounded by a channel of the river and not a sandbar subject to overflow by a rise in the river and connected with the land when the water is low." This instruction again directs the attention of the jury to the present condition of Coonskin Island when the controlling consideration is what was its nature at the time defendant acquired the riparian main land. Land originally an island and formed in the bed of a navigable stream belongs to the state, but even if not originally an island or if after originating as an island it ceases to be an island and becomes an accumulation, such land also belongs to the state and an instruction to the effect that land not an island formed in the bed of a navigable stream does not belong to the state excludes such accumulation and is therefore erroneous.    Instructions touching accumulations were proffered by plaintiff, but, as has been said, were refused by the court. It was also error for the court to instruct that defendant would take by his patent to highwater mark as it existed at the date of the patent. He would take to the highwater mark described in survey 41 made ten years before his patent with such accretions as might have been added since. (*Glassell* v. *Hansen*, 135 Cal. 547, [67 Pac. 964] ; *Buse* v. *Russell*, 86 Mo. 209 ; *Salem Imp. Co.* v. *McCourt*, 26 Ore. 93, [41 Pac. 1105] ; *Hahn* v. *Dawson*, 134 Mo. 581, [36 S. W. 233].)

For these reasons the judgment and order appealed from are reversed and the cause remanded for a new trial.

Melvin, J., Shaw, J., Angellotti, J., Sloss, J., and Lorigan, J., concurred.

Rehearing denied.